**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DRL ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. |
| NORTH ATLANTIC OPERATING | ) | |
| COMPANY, INC., | ) | |
| NORTH ATLANTIC TRADING | ) | |
| COMPANY, INC., and | ) | |
| NATIONAL TOBACCO COMPANY, L.P. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR REVIEW OF
TRADEMARK TRIAL AND APPEAL BOARD DECISION**

DRL Enterprises, Inc. for its Complaint against defendants North Atlantic Operating Company, Inc., North Atlantic Trading Company, Inc., and National Tobacco Company (collectively, "Defendants"), alleges as follows:

**THE PARTIES**

1.     DRL Enterprises, Inc. is a Delaware corporation and maintains a place of business at 2301 Ravine Way, Glenview, Illinois 60025.  Since the mid-1970s, DRL Enterprises, Inc. and its predecessors ("DRL") have been in the business of developing, manufacturing, distributing and selling roll-your-own cigarette products, including cigarette rolling paper booklets.

2.     On information and belief, National Tobacco Company, L.P. ("NTC") is a Delaware limited partnership and maintains a place of business at 5201 Interchange Way, Louisville, Kentucky 40229.

3.      On information and belief, North Atlantic Operating Company, Inc. ("NAOC") is a Delaware corporation and maintains a place of business at 5201 Interchange Way, Louisville, Kentucky 40229.

4.      On information and belief, North Atlantic Trading Company, Inc. ("NATC") is a Delaware corporation and maintains a place of business at 5201 Interchange Way, Louisville, Kentucky 40229.

5.      On information and belief, NAOC and NTC are wholly owned subsidiaries of NATC, which is a wholly owned subsidiary of NATC Holding Company, Inc., a Delaware corporation, which, in turn, is a wholly owned subsidiary of Turning Point Brands Inc. ("TPB"), a Delaware corporation.

6.      Defendants, collectively, have also long been in the business of developing, manufacturing, distributing and selling roll-your-own cigarette products, including cigarette rolling paper booklets.

## JURISDICTION AND VENUE

7.      This is an appeal, pursuant to 15 U.S.C. § 1071(b)(1), of a decision by the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("PTO").

8.      This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 (a) and (b) in that it involves an action arising under the Lanham Act.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) in that a substantial part of the activities giving rise to the claims alleged herein occurred in this District, a

substantial part of the property that is the subject of this action is situated in this District, and the Defendant is subject to personal jurisdiction within this district.

## NATURE OF THE CASE

10.    Since the mid-1970s, DRL has sold the only cigarette paper booklets using the designations 1.5, 1.25 and 1.0 (the "Point Marks") in stylized and unstylized forms as trademarks.  The Point Marks identify DRL as the source of its premium style of cigarette paper that have always been made with a proprietary formula.  All other brands of cigarette paper booklets distributed by other parties over the past four decades – including the ZIG ZAG papers distributed by Defendants – contain cigarette paper made with different formulae.  Booklets of these papers use the terms 1½, 1¼ and single (and not the trademarks 1.5, 1.25 or 1.0).  Though DRL and its affiliates use fractional designations for other cigarette paper booklets they sell, the cigarette paper used in booklets that display the Point Marks is unique and different from every other formulation on the market.  Point Marks branded papers command a premium in the marketplace.  Consumers are willing to pay more for papers using DRL's unique formula identified by the Point Marks.

11.    Decades ago, DRL protected its marks by registering them in stylized form with the United States Patent and Trademark Office.  Registration No. 1,331,207 for the mark 1.5 and Registration No. 1,328,866 for the mark 1.25 issued in April 1985.  Registration No. 1,481,006 for the mark 1.0 issued in March 1988.  In 2001, after decades of successful and exclusive use of the Point Marks to identify its booklets of uniquely formulated premium cigarette papers, DRL decided to expand its use of these marks and applied to register the marks 1.0, 1.25, 1.5 and 2.0 in stylized and unstylized form in connection with cigarettes.[1]  DRL sought to protect its brand

---

[1]   Serial Nos. 76/296,942 (for 1.0), 76/296,931 (for 1.25), 76/296,945 (for 1.5) and 76/296,926 (for 2.0) and 76/296,941 (for 1.0 Stylized), 76/296,943 (for 1.25 Stylized) and 76/296,944 (for 1.5 Stylized).

further by applying to register the marks 1.5 and 1.25 in unstylized form for cigarette papers.[2] During the prosecution of these applications, while maintaining that these marks are inherently distinctive, DRL submitted substantial evidence of acquired distinctiveness. In 2003, after considering such evidence, the Trademark Office approved the applications for publication.

12. Seeking to erode the long-standing value of DRL's trademarks, Defendants opposed the applications and petitioned to cancel DRL's long-held registrations for the marks.

13. After more than a decade of discovery, and without any evidence showing that consumers view these marks as generic or descriptive, on July 1, 2016, a Trademark Trial and Appeal Board ("TTAB") panel (i) sustained Defendants' opposition to the registration of the marks 1.25 and 1.5 in standard character form for cigarette papers (namely, Serial Nos. 76/369,872 and 78/157,851), and (ii) granted Defendant's petitions to cancel Registration Nos. 1,331,207, 1,328,866 and 1,481,006.[3] The TTAB's decision was based on its finding that the marks 1.5, 1.25 and 1.0 are generic or merely descriptive size designators for cigarette paper booklets. The TTAB's decision was in error in that it ignored basic principles of evidence and was not supported by the law or the evidence.

14. By this action, Plaintiff seeks an order from this court reversing and vacating the portions of TTAB's July 1, 2016 order finding that the marks 1.0, 1.25, and 1.5 are generic or merely descriptive for cigarette papers, and directing the TTAB to dismiss Defendants' Petition to Cancel Trademark Registration Nos. 1,481,006, 1,331,207, and 1,328,866, and Notices of Opposition to Application Serial Nos. 76/369,872 and 78/157,851.

---

[2] Serial Nos. 76/369,872 (for 1.25) and 78/157,851 (for 1.5).

[3] The TTAB also found that the marks 1.0, 1.25, 1.5 and 2.0 are distinctive when used with cigarettes, and therefore denied Defendants opposition to DRL's applications for those marks, namely Serial Nos. 76/296,942 (for 1.0), 76/296,931 (for 1.25), 76/296,945 (for 1.5) and 76/296,926 (for 2.0) and 76/296,941 (for 1.0 Stylized), 76/296,943 (for 1.25 Stylized) and 76/296,944 (for 1.5 Stylized). DRL Enterprises does not appeal those portions of the TTAB's decision.

## COMMON ALLEGATIONS

### (DRL and its Point Marks)

15.　　In the 1970s, cigarette papers, including those sold by Defendants' predecessor, did not display size designations. As the market grew and segmented, manufacturers introduced relative sizes within lines of papers, although paper sizes varied between manufacturers and between lines.

16.　　Since at least the early 1970's, cigarette papers have been made from a variety of materials, including flax, wood pulp, rice and hemp, have varied in thicknesses and porosity, and contain different kinds of vegetable and animal glue.  These factors give each cigarette paper a different feel and taste, and provide the consumer with different rolling and smoking experiences.

17.　　In 1976, after years of distributing cigarette papers manufactured by others, the predecessor of DRL began working with a French cigarette paper manufacturer, Societé JOB, the makers of JOB branded cigarette papers, and a paper mill, Papeteries Du Leman, to develop for an exclusive premium cigarette paper that would provide smokers with a unique smoking experience and taste.

18.　　To brand its new, proprietary, premium papers with a unique and distinctive trademark, DRL developed and adopted the designation 1.5, which was displayed in a stylized

format on the outside of the cigarette paper booklets and in a standard character format on the inside of the booklets:






(outside of booklet)                    (inside cover of booklet)

19.     Prior to the introduction of these papers to the market, there were no standard sizes of cigarette papers and cigarette papers did not typically display size designations, in numeral or any other form.

20.     The 1.5 branded cigarette papers were quickly accepted by the marketplace and established a strong consumer following.  In light of the success of the 1.5 branded papers, in 1977, DRL worked with its manufacturer to develop a second line of the same premium paper, made with the same high-quality, proprietary formula, which it branded 1.25:




(outside of booklet)                    (inside cover of booklet)

21.     At that time, the designations 1.5 or 1.25 were not used by another cigarette paper manufacturer to identify a size of a cigarette paper or a unique, propriety blend of cigarette paper; nor at any time since have the designations 1.5 or 1.25 been used by another cigarette paper manufacturer to identify a size of a cigarette paper or a unique, propriety blend of cigarette

paper. Other cigarette paper manufacturers have only used the designations "single," 1¼, 1½, "double" or "king" to indicate a size of a paper made with other blends or formulae.

22.     Later, in 1985, to further capitalize on the commercial success of its 1.5 and 1.25 branded cigarette papers, DRL developed and began selling 1.0 branded cigarette paper booklets made from the same premium proprietary paper blend:

     

          (outside of booklet)                    (inside cover of booklet)

23.     Later, DRL developed and began selling a "silver" line of these cigarette paper booklets, which are thinner than the "gold" papers depicted above, but made from the same premium, high-quality formula:

     

     



24.     Still later, to further capitalize on the popularity of its Point Marks premium papers, DRL developed and began selling a 1.5 Slim line of cigarette papers:





(outside of booklet)                    (inside cover of booklet)

25.     Since their first sale, all of the Point Marks branded papers, including the "gold" and "silver" lines of 1.5, 1.25 and 1.0 brand cigarette papers and the 1.5 Slim brand cigarette papers, have displayed the 1.5, 1.25 and 1.0 marks in the same stylization and standard character formats shown above, and they have always been made of the same unique and proprietary formula.

26.     For over forty years, DRL and its distributor, Republic Tobacco, L.P. ("Republic"), have marketed, promoted and advertised cigarette papers bearing the Point Marks to wholesalers and retailers.  DRL and Republic Tobacco annually attend numerous national and regional trade shows to promote Point Marks branded cigarette papers.  Point Marks branded papers have been featured in tobacco industry trade publications and trade show directories and publications, and are promoted by a national sales force to wholesalers and retailers in promotional fliers, annual incentive programs (which incentivize retailers to promote them to consumers) and rebate programs.

27. DRL also promotes its papers bearing the Point Marks directly to consumers. Given regulations in the tobacco industry, DRL's promotional efforts are now largely restricted to "point-of-sale" materials, which include shelf talkers, product displays and bowl collars. In adults-only locations, such as specialty tobacco shops, Republic Tobacco also provides retailers with posters, banners, counter pads, stickers and cards for windows, cases and aisles.

28. Through these various methods, over four decades, many millions of dollars have been spent promoting and marketing the Point Marks branded cigarette papers. These promotional efforts have been successful, and annual sales of Point Marks branded papers are now in the tens of millions of dollars. Point Marks branded cigarette papers are sold in over 125,000 retail outlets nationwide, including convenience stores, tobacco stores, tobacco outlets, drug stores, gas stations, mini-marts, dollar stores, convenience stores, and mass merchandisers.

**(Prosecution History of the Point Marks)**

29. In 1982, to protect its Point Marks, DRL filed trademark registration applications for the stylized displays of the marks 1.5 and 1.25. During its consideration of DRL's applications, the Trademark Office weighed evidence showing that the marks were distinctive of DRL's cigarette papers, including: (i) evidence of substantial expenditures on the promotion of the 1.5 and 1.25 branded papers; (ii) evidence of substantial sales emanating from such promotion; (iii) evidence that DRL was the only company to use the designations in connection with cigarette papers; and (iv) declarations from members of the tobacco industry stating that the primary significance of the designations is to identify DRL as the source of its cigarette papers.

9

After considering such evidence, the Trademark Office approved the applications. Registrations for the marks 1.5 and 1.25 in stylized form issued in April 1985 and are now incontestable, pursuant to 15 U.S.C. § 1065:

     

Reg. No. 1,331,207          Reg. No. 1,328,866

30.     In 1986, DRL filed an application to register its 1.0 mark in stylized form. After weighing similar evidence of promotion and exclusive use, the Trademark Office approved the application. The registration for the mark 1.0 issued on March 15, 1988, and has also become incontestable, pursuant to 15 U.S.C. § 1065:



Reg. No. 1,481,006

31.     In 2001, after decades of exclusive use of the Point Marks to identify its unique, premium cigarette papers, DRL decided to expand its use of these marks and applied to register them in stylized and unstylized form in connection with cigarettes. *See* Serial Nos. 76/296,942 (for 1.0), 76/296,931 (for 1.25), 76/296,945 (for 1.5) and 76/296,926 (for 2.0) and 76/296,941 (for 1.0 Stylized), 76/296,943 (for 1.25 Stylized) and 76/296,944 (for 1.5 Stylized). DRL also sought to protect its brand further by applying to register the marks 1.5 and 1.25 in unstylized form for cigarette papers. *See* Serial Nos. 76/369,872 for the mark 1.25 and 78/157,851 for the mark 1.5. During the prosecution of these applications, while maintaining that these marks are inherently distinctive, DRL submitted substantial evidence of acquired distinctiveness, including evidence of DRL's exclusive use of the marks since the 1970s, the type and extent of DRL's

advertising and promotion of the marks, and consumers' association of the marks with DRL. In 2003, after considering such evidence, the Trademark Office approved the applications for publication.

**(Defendants Cannot Use the Point Marks and Have Acknowledged
DRL's Rights in the Point Marks)**

32.     Since the early 1990s, Bolloré S.A. and its predecessors ("Bolloré") have been the trademark holder, licensor and supplier in the United States of ZIG-ZAG branded cigarette papers, cigarette paper booklets, filter tubes, injector machines and filter tips. In 1992, NAOC (through its predecessor-in-interest) became, and remains to this day, Bolloré's exclusive United States distributor of ZIG-ZAG branded products pursuant to an Amended and Restated Distribution and License Agreement between Bolloré and NAOC, dated November 30, 1992, as subsequently amended and ratified on numerous occasions (the "Bolloré License Agreement").

33.     Under the Bolloré License Agreement, the only cigarette paper products that Defendants are permitted to distribute are the ZIG-ZAG branded products that NAOC buys from Bolloré. More specifically, under the agreement, NAOC agreed to not, directly or indirectly, manufacture, sell, distribute, market or promote cigarette papers, cigarette paper booklets, filter tubes, injector machines or filter tips, except for those provided by Bolloré. The Bolloré License Agreement also prohibits Defendants from advertising, packaging or marketing Bolloré's cigarette papers in any manner that does not meet with Bolloré's approval.

34.     The Bolloré License Agreement is a long-term agreement that automatically renews for successive twenty (20) year periods. Its current term runs through November 30, 2032. NAOC may not unilaterally terminate the agreement. Rather, the termination provisions relate only to those conditions under which Bolloré may terminate. The Bolloré License Agreement contains a non-competition clause that, in the very unlikely event it is ever

11

terminated, prohibits NAOC from directly or indirectly manufacturing, selling, distributing or otherwise dealing in or being associated with any cigarette papers, cigarette paper booklets, filter tubes, injector machines or filter tips, for five (5) years after termination.

35.     The Bolloré License Agreement is among the Defendants' most valuable assets and its continuation is of material importance to the public stockholders and debt holders of TPB. TPB's public stockholders and debt holders relied upon the existence and continuation of the agreement in acquiring their interest in or in providing financing to the company.  The Bolloré License Agreement has been identified in numerous SEC filings as an asset of critical importance to TPB and its stockholders and debt holders.  Among other things, TPB has reported that its second amended and restated certificate of incorporation limits the ownership of its common stock by certain investors to protect the Bolloré License Agreement.  Further, TPB has reported that its first tier $170 Million credit agreement expressly requires that the Bolloré License Agreement be maintained.

36.     On multiple occasions, over several decades, Bolloré has acknowledged DRL's exclusive rights in the Point Marks, and has agreed to never produce products using the Point Marks, nor to allow Defendants to use the Point Marks in connection with their ZIG-ZAG cigarette papers.

37.     Not only are Defendants prohibited from using the Point Marks in connection with cigarette papers by Bolloré and the Bolloré License Agreement terms, but, on multiple occasions, Defendants themselves have acknowledged DRL's rights in the Point Marks and agreed to not use the Point Marks.  The Defendants expressly agreed not to use Point Marks, but to continue their practice of using the terms 1½ and 1¼, which they and everyone else in the industry have done for decades.

**(Industry and Consumer Recognition and DRL's Exclusive Use of the Point Marks)**

38.     DRL has consistently and effectively enforced its rights in the Point Marks, and the tobacco industry has consistently acknowledged DRL's rights in the Point Marks.  Notably, Robert Burton Associates, Ltd., (and its successor, Imperial Tobacco PLC, and its distribution subsidiary, Commonwealth Brands, Inc.), which together with Bolloré and DRL, make up the most significant portion of the premium cigarette paper market, has also acknowledged that the Point Marks are exclusive marks of DRL and identify DRL as the source of the cigarette papers that bear them.  Further, on the few occasions where a cigarette paper manufacturer has begun or taken steps to use one of the Point Marks with a cigarette paper, DRL has objected, and in each such instance, the manufacturer has: (i) destroyed or re-labeled the papers such that no booklet bearing the infringing designation was sold; (ii) promptly ceased sale of the infringing product; or (iii) entered into a Consent Judgment that recognizes DRL's rights in, and prohibits the use of, the Point Marks with cigarette papers.

39.     DRL has also actively policed the use of its marks by distributors and retailers. When DRL has learned that a distributor or retailer of cigarette papers has mistakenly used the Point Marks in promotional material to identify cigarette papers made by others it has requested that they correct their material.  These distributors and retailers have complied with DRL's requests.

**(The TTAB Proceedings)**

40.     Despite the aforesaid acknowledgements and agreements, and Defendants' inability to use the Point Marks under its agreement with Bolloré, in 2003, Defendants (i) petitioned to cancel DRL's long-held registrations for the marks 1.5, 1.25 and 1.0 in stylized

form for cigarette papers, pursuant to 15 U.S.C. § 1064,[4] (ii) opposed DRL's applications to register the marks 1.5 and 1.25 in standard character form for cigarette papers, pursuant to 15 U.S.C. § 1063,[5] and (iii) opposed DRL's applications to register the marks 1.0, 1.25, 1.5 and 2.0 in stylized and standard character format with cigarettes, pursuant to 15 U.S.C. § 1063.[6]  All of these proceedings were consolidated under Opposition No. 91158276.  Although Defendants raised a number of bases for their petitions and oppositions during the pendency of the TTAB proceedings, before trial, they waived all of their allegations with respect to cigarette papers, except their allegations (i) that the registered, stylized forms of the mark are (and were when the registrations issued) generic for cigarette papers, and (ii) that the standard character terms 1.5 and 1.25 are generic or, in the alternative, are descriptive (and have not acquired distinctiveness) for cigarette papers.

### (Defendants Lack Standing to Challenge DRL's Rights in the Point Marks)

41.    Any person who may be damaged by a registration may oppose an application under 15 U.S.C. §1063 or petition to cancel a registration under 15 U.S.C. § 1054 on the basis that such terms are generic or descriptive, provided such person has a "real interest" or a "direct personal stake" in the proceedings.  *Ritchie v. Sampson*, 170 F.3d 1092, 50 USPQ2d 1023, 1029 (Fed. Cir. 1999)**.**  But, this requires that an opposer have "a present or prospective right to use the term descriptively (or generically) in its business."  *Nobelle.com v. Quest Comm. Int'l, Inc.,* 66

---

[4] Cancellation No. 92042928 (Reg. No. 1,331,207 for the mark 1.5); Cancellation No. 92043031 (Reg. No. 1,328,866 for the mark 1.25) and Cancellation No. 92042927 (Reg. No. 1,481,006 for the mark 1.0).

[5]  Opposition No. 91158568 (Serial No. 78/157,851 for the mark 1.5) and Opposition No. 91158276 (Serial No. 76/369,872 for the mark 1.25).

[6]  Opposition No. 91158980 (Serial No. 76/296,942 for the mark 1.0); Opposition No. 91159360 (Serial No. 76/296,941 for the mark 1.0 stylized); Opposition No. 91158696 (Serial No. 76/296,931 for the mark 1.25); Opposition No. 91158552 (Serial No. 76/296,943 for the mark 1.25 stylized); Opposition No. 91158981 (Serial No. 76/296,945 for the mark 1.5); Opposition No. 91158978 (Serial No. 76/296,944 for the mark 1.5 stylized).  As noted above, these proceedings are not at issue here.

USPQ2d at 1300, 1304 (TTAB 2003). It must "be in a position to have a right to use the mark in question." *Id; see also Duramax Marine LLC v. R.W. Fernstrum & Co.*, 80 USPQ2d 1780, 1788 n.15 (TTAB 2006); *No Nonsense Fashions, Inc. v. Consolidated Foods Corporation*, 226 USPQ 502 (TTAB 1985); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 20:50.

42.     By virtue of NAOC's contractual obligations with Bolloré, the restrictions in TPB's debt instruments and obligations to public stockholders, and Defendants' prior agreement not to use the Point Marks, Defendants are not in a position to use the Point Marks and therefore cannot establish a "real interest" or "direct personal stake" in this proceeding. Moreover, because they have a decades-long practice of using the terms 1½ and 1¼, Defendants will not be damaged by DRL's registration of the Point Marks. Defendants therefore should be found to lack standing to challenge DRL's registrations and applications for the Point Marks.

43.     Despite Defendants' lack of real interest in the proceedings, lack of reasonable basis to believe they would be damaged, and prior acknowledgement of and acquiescence to DRL's rights in the Point Marks, on April 29, 2014, the TTAB denied DRL's motion for summary judgment challenging Defendants' standing, holding that even if Defendants cannot themselves use the Point Marks in connection with cigarette papers, it is sufficient that they alleged that registration of the Point Marks will cause damage by inhibiting competition with others in the industry. It also held as a matter of law, that notwithstanding of Defendants' unique circumstances, Defendants were not equitably estopped from challenging the Point Marks on the basis of genericness or descriptiveness.

44.     The TTAB affirmed this ruling in its decision after trial, rendered on July 1, 2016, holding that Defendants had standing because they established that they and DRL sell cigarette

15

papers, and accordingly are competitors. The TTAB further found, erroneously, that "Plaintiffs could terminate their distribution agreement with Bolloré and find a new supplier of cigarette rolling papers. Plaintiffs' prospective interest in one day using the [Point Marks] to describe the size of their products is a sufficient interest to support standing." TTAB Order, p. 31-32.

45. Contrary to the TTAB's holding, as alleged above, NAOC does not have the right to unilaterally terminate the Bolloré License Agreement, which extends through at least November 30, 2032. Moreover, the Bolloré License Agreement prohibits Defendants from directly or indirectly manufacturing, selling, distributing or otherwise dealing in or being associated with the cigarette papers, cigarette paper booklets, filter tubes, injector machines or filter tips of others for a five-year period following the expiration of the agreement. Further, the obligations TPB owes to its public investors and debt holders require that the agreement be maintained. From a financial, commercial and practical standpoint, therefore, Defendants are unable to terminate the Bolloré License Agreement and still remain in the cigarette paper market.

46. The TTAB Order relies on *Duramax Marine LLC v. R.W. Fernstrum & Co.*, 80 USPQ2d 1780, 1787-1788 (TTAB 2006) for the proposition that even a competitor that has contracted away its ability to use a mark has sufficient standing to oppose on the basis of descriptiveness, in order to prevent the applicant from gaining a competitive advantage. DRL contends, however, that, at least in this respect, *Duramax* was wrongly decided. A party that has no prospective ability to use a mark, nor the need to use the mark, should not be found to have a 'real interest' in whether that mark is registered. That party has no 'reasonable basis' for its belief of damage, any more than any other mere intermeddler does. Further, as a matter of public policy, to allow opposition and cancellation actions solely to prevent a competitor from gaining any competitive advantage, is to encourage vexatious TTAB practice.

16

47.     Moreover, even under the rule of *Duramax*, and even if competitive advantage is sufficient to furnish Defendants with standing, they should be estopped from bringing these claims on the basis that, over the course of many years, Defendants acknowledged that the Point Marks identify DRL as the source of its cigarette papers and agreed that they would not use the Point Marks, assurances on which DRL relied in investing further in its Point Marks brands.

**(TTAB's Erroneous Disposition of Defendants' Claims)**

48.     On July 1, 2016, in its decision after trial, the TTAB found that the marks 1.0, 1.25 and 1.5 are generic size designations for cigarette papers and that the stylizations of Registration Nos. 1,331,207 (for 1.5), 1,328,866 (for 1.25) and 1,481,006 (for 1.0) are not sufficiently distinctive to entitle the stylized versions of the marks to registration.  The TTAB also found that if the marks are in fact descriptive (and not generic) size designations for cigarette papers, they have not acquired sufficient distinctiveness to be entitled to registration.[7] In so holding, the TTAB erred in several respects.

49.     First, the TTAB erred in finding that, under the facts and circumstances of this case, the Defendants have standing to petition to cancel Registration Nos. 1,331,207, 1,328,866 and 1,481,006 and to oppose Application Serial Nos. 78/157,851 and 76/369,872.

50.     Second, even if Defendants had standing, the TTAB erred in finding that, under the circumstances of this case, the Defendants are not equitably estopped from challenging the registerability of the Point Marks and from maintaining the TTAB proceedings.

---

[7]  The TTAB went on to hold that the Point Marks registerable trademarks for cigarettes, finding that they are neither generic for nor descriptive of cigarettes, and therefore dismissed Defendants' oppositions to DRL's application for the marks with cigarettes, namely Opposition No. 91158980 (Serial No. 76/296,942 for the mark 1.0); Opposition No. 91159360 (Serial No. 76/296,941 for the mark 1.0 stylized); Opposition No. 91158696 (Serial No. 76/296,931 for the mark 1.25); Opposition No. 91158552 (Serial No. 76/296,943 for the mark 1.25 stylized); Opposition No. 91158981 (Serial No. 76/296,945 for the mark 1.5); Opposition No. 91158978 (Serial No. 76/296,944 for the mark 1.5 stylized).  DRL does not appeal this portion of the TTAB decision.

51. Third, the TTAB failed to properly assign the burdens of proof. DRL's long-standing registrations are presumed to be valid, which includes the presumption that the marks are not generic. *Editorial America, S.A. v. Gruner + Jahr AG & Co.*, 213 USPQ 498, 504 (TTAB 1982). Overcoming this burden requires a substantial showing of unambiguous evidence. *Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1763 (TTAB 2013) (dismissing petition to cancel on the ground of genericness). Therefore, defendants were and are required to "establish facts which would overcome these presumptions." *Standard Products Co., Inc. v. Food Specialty Co., Inc.*, 151 USPQ 647, 648 (TTAB 1966). With respect to DRL's oppositions, Defendants had, and have, the burden of rebutting the DRL's evidence of distinctiveness made of record during prosecution which led to registration of the Point Marks. *Yamaha International Corp. v. Hoshino Gakki Co. Ltd*., 840 F.2d 1572 (Fed. Cir. 1988). Defendants failed to meet, and cannot now meet, these burdens and the TTAB erred in not dismissing their claims on that basis.

52. Fourth, the TTAB erred in relying on significant inadmissible evidence in making its findings of fact. While the TTAB indicated that it is "is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence," it erred in admitting and relying upon voluminous inadmissible evidence, much of which was not properly or timely introduced by defendants.

53. Fifth, the TTAB erred in finding that the registered, stylized Point Marks are generic and unregisterable. Once registered, the stylized Point Marks, which the Trademark Office found sufficiently distinctive to support registration, carried with them presumptions of distinctiveness and registerability for thirty years. Defendants failed to meet their burden and

presented no evidence of consumer or industry perception of the stylizations and the TTAB erred in basing its decision entirely on its own, subjective view of the marks.

54.     Sixth, the TTAB erred in finding that the Point Marks are generic for cigarette papers.  Defendants presented no evidence whatsoever of public understanding or perception that the Point Marks to refer to the genus cigarette papers.  Nevertheless, the TTAB, relying in large part on unreliable, inadmissible evidence, held that the Point Marks provide only a generic description of cigarette papers.

55.     Seventh, the TTAB compounded its error in holding that the Point Marks are merely descriptive of cigarette papers, despite the voluminous evidence over decades showing that the Point Marks are distinctive, and identify DRL as the source of the unique, premium papers that bear them.

## COUNT I

### REQUEST FOR REVERSAL OF TTAB DECISION IN CANCELLATION NOS. 92042927, 92042928, AND 92043031 15 U.S.C. § 1071(b)

56.     Plaintiffs reallege and incorporate herein paragraphs 1 through 55 of this Complaint.

57.     The TTAB erroneously concluded that:

(a)     the Defendants have standing to challenge the Point Marks;

(b)     the Defendants are not equitably estopped from petitioning to cancel Registration Nos. 1,331,207, 1,328,866 and 1,481,006;

(c)     the Point Marks are generic for cigarette papers; and

(d)     the stylization of Reg. Nos. 1,331,207, 1,328,866 and 1,481,006 is insufficient to create a registrable mark.

58.     The TTAB decision of July 1, 2016 should be reversed and vacated, and an order should be entered directing the PTO to reverse its decision and dismiss Cancellation Nos. 92042927, 92042928, and 92043031.

## COUNT II

**REQUEST FOR REVERSAL OF TTAB DECISION IN OPPOSITION NOS. 91158276 AND 91158568 15 U.S.C. § 1071(b)**

59.     Plaintiffs reallege and incorporate herein paragraphs 1 through 55 of this Complaint.

60.     The TTAB erroneously concluded that:

(a)     the Defendants have standing to oppose the registration by DRL of the marks 1.5 and 1.25 (Serial Nos. 78/157,851 and 76/369,872),

(b)     the Defendants are not equitably estopped from opposing applications Serial Nos. 78/157,851 and 76/369,872; and

(c)     the Point Marks in standard character form are generic or merely descriptive of cigarette papers.

61.     The TTAB decision of July 1, 2016 should be reversed and vacated, and an order should be entered directing the PTO to reverse its decision and dismiss Opposition Nos. 91158276 and 91158568.

## PRAYER FOR RELIEF

WHEREFORE, as to all Counts of this Complaint, Plaintiffs request that this Court enter a judgment in favor of Plaintiff and against Defendants reversing and vacating the July 1, 2016 decision of the TTAB in the matter of *North Atlantic* Operating *Company, Inc., et al. v. DRL Enterprises, Inc.*, Opposition Nos. 91158276 and 91158568, and Cancellation Nos. 92042927, 92042928, and 92043031, pursuant to 15 U.S.C. § 1071(b), dismissing the aforesaid cancellation

and opposition proceedings together with such other and further relief as this Court may deem equitable and just.

Dated: August 26, 2016                          Respectfully Submitted,


                                                By: /s/Antony J. McShane
                                                    One of the Attorneys for Plaintiff,
                                                    DRL Enterprises, Inc.


Antony J. McShane (ARDC# 6190332)
Michael Kelber (ARDC # 6231033)
Katherine Dennis Nye (ARDC# 6300440)
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 1700
Chicago, Illinois  60602
Telephone:  (312) 269-8000
Facsimile:  (312) 269-1747


25063789.11