# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DRL ENTERPRISES, INC.,     )
          )
    Plaintiff,    )
          )    **No. 16 C 8384**
    v.    )
          )    **Chief Judge Rubén Castillo**
NORTH ATLANTIC OPERATING     )
COMPANY, INC., NORTH ATLANTIC     )
TRADING COMPANY, INC., and     )
NATIONAL TOBACCO COMPANY,     )
L.P.,     )
          )
    Defendants.    )

## MEMORANDUM OPINION AND ORDER

DRL Enterprises, Inc. ("Plaintiff") filed this action under Section 21 of the Lanham Act,

15 U.S.C. § 1071, seeking review of a decision by the U.S. Patent and Trademark Office's

Trademark Trial and Appeal Board (TTAB) cancelling three federal trademarks registered to

Plaintiff and rejecting several of its related applications for trademark registration as generic.[1]

(R. 1, Compl.) Plaintiff now moves for summary judgment reversing the TTAB's decision on the

ground that the parties who petitioned to cancel Plaintiff's existing registrations and opposed its

related applications, North Atlantic Operating Company, Inc. ("NAOC"), North Atlantic Trading

Company, Inc. ("NATC"), and National Tobacco Company, L.P. ("NTC") (collectively,

"Defendants"), lacked standing to do so. (R. 45, Mot.; R. 51, Mem.[2]) Defendants oppose the

---

[1] The somewhat unusual posture of this case owes to Section 21(b)(1) of the Lanham Act, which authorizes appeals of Trademark Trial and Appeal Board decisions "by a civil action" in federal district court as an alternative to appealing to the U.S. Court of Appeals for the Federal Circuit. 15 U.S.C. § 1071(b)(1); *see also CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001) ("Any party dissatisfied with the TTAB's decision may appeal either to the United States Court of Appeals for the Federal Circuit or to a federal district court.").

[2] Throughout this opinion, the Court cites to the unredacted, confidential version of filings in this case.

motion, (R. 62, Opp'n), and Plaintiff has filed a reply, (R. 72, Reply). For the reasons set forth below, the Court denies the motion.

## LEGAL STANDARDS

Before recounting the relevant facts or turning to the standards that generally apply to Plaintiff's motion, the Court addresses special considerations that apply in this unique case. A proceeding in district court under Section 21 is "both an appeal and a new action, which allows the parties to request additional relief and to submit new evidence" that was not before the TTAB. *Bd. Of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.*, 653 F.3d 448, 452 (7th Cir. 2011) (citation omitted). The district court's role is unique in that it acts as both "an appellate reviewer of facts found by the TTAB and . . . also a fact-finder based on new evidence introduced to the court." *Id.* (citation omitted); *see also Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 391 (7th Cir. 1992) (describing the review mechanisms under Section 21 as "unique"). While the Court reviews the TTAB's ultimate decision *de novo*, as an appellate reviewer the Court must give deference to the TTAB's findings of fact by applying the substantial evidence standard set forth in Section 706 of the Administrative Procedure Act. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 674-76 & n.9 (7th Cir. 2001). Under that standard, the Court may set aside or disregard the TTAB's factual findings only if "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E), which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *CAE, Inc.*, 267 F.3d at 675 (citation omitted). Accordingly, while applying ordinary summary judgment standards to Plaintiff's motion, the Court must credit

any relevant factual findings by the TTAB that are supported by substantial evidence.[3] *See Bd. Of Regents of Univ. Of Wis. Sys.*, 653 F.3d at 452 (noting with approval that district court "applied a deferential standard of review to the TTAB's findings . . . and for summary judgment purposes . . . viewed new evidence in the light most favorable to the nonmoving party"). With that in mind, the Court turns to the familiar standards for summary judgment.

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the

---

[3] The parties have not addressed the TTAB's factual findings, but the Court has undertaken its own review of those findings and the supporting record. Findings that the Court finds to be supported by substantial evidence are incorporated as relevant and are followed by a citation to the TTAB's decision, using the same convention for TTAB filings that the parties have used in their briefs (*e.g.*, 245 TTABVUE 54).

nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [its] favor." *Id.* (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

In deciding a summary judgment motion, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Instead, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

## RELEVANT FACTS

The following facts are undisputed unless otherwise stated. Plaintiff and Defendants are longtime competitors in the tobacco product and accessories business, including the roll-your-

own cigarette paper business.[4] (R. 56, Defs.' Add'l Facts ¶ 1.) Cigarette papers come in varying sizes, which consumers choose based on their skill in rolling cigarettes and the amount of tobacco or other material they intend to roll into the cigarette. (245 TTABVUE 54.) The four principal sizes of cigarette papers are: (1) single wide or single width; (2) 1¼; (3) 1½; and (4) double wide. (*Id.*) Although there are no industry standards governing the dimensions of cigarette papers, the size designations generally correlate to the surface area of the paper. (*Id.*) Thus, the overall size of a cigarette paper increases as the numerical designation increases. (R. 56, Defs.' Add'l Facts ¶ 2.)

In the 1980's, the U.S. Patent and Trademark Office granted Plaintiff federal trademark registration of the marks "1.5," "1.25," and "1.0" (the "Point Marks"), in stylized form, for use with cigarette papers. (*Id.*, Defs.' Resp. to Facts ¶¶ 1-3.) These marks, corresponding to Registration Nos. 1,331,207, 1,328,866, and 1,481,006, respectively, are shown below. (*Id.*)

  

In February 2002, Plaintiff filed applications to register the marks "1.5" and "1.25" in standard character form, also for use with cigarette papers. (*Id.* ¶ 5; R. 49-2, Gold Decl. ¶ 49.)

Defendants are the exclusive United States distributors of "ZIG-ZAG" brand cigarette papers, which they purchase from French company Bolloré, S.A., the holder and licensor of the

---

[4] As the parties largely treat Defendants collectively for purposes of the motion, the Court will as well, except where necessary to distinguish them. In any event, Defendants NAOC and NTC are wholly-owned subsidiaries of Defendant NATC. (R. 18, Answer ¶ 5.)

ZIG-ZAG trademark.[5] (R. 56, Defs.' Resp. to Facts ¶¶ 6, 8.) Defendants use the fractional terms 1¼ and 1½ to denote the size of their cigarette papers. (*Id.* ¶ 4.)

In January 1997, believing that Defendants were beginning to promote cigarette papers with packaging that used the "1.5" mark, Plaintiff wrote to Defendants to object and request that they cease and desist. (*Id.* ¶ 26.) Counsel for Plaintiff and Defendants exchanged multiple letters in the ensuing months. (*Id.* ¶ 27; R. 60, Dobbins Decl. ¶ 6.) In a first response, dated February 24, 1997, Defendants' counsel wrote in relevant part:

> Our client, NATC, has now had an opportunity to consider your proposal that it continue its practice of marking its cigarette papers with the designations 1, 1¼ and 1½, rather than the designations 1.0, 1.25 and 1.5. We understand . . . that this would relieve [your] concerns that confusion could result from NATC's use of the 1.0, 1.25 and 1.5 designations.
>
> Like [Plaintiff], NATC wishes to avoid the expense and distraction of litigation.
>
> Accordingly, without making any admissions regarding the merits of [Plaintiff's] charge of infringement, but solely to avoid litigation, NATC intends to continue its practice of using the designations 1, 1¼ and 1½ for its cigarette papers and to refrain from using the designations 1.0, 1.25 and 1.5.
>
> NATC's decision is conveyed to you in the spirit of cooperation, and is without prejudice and not to be deemed binding through contract, estoppel or otherwise.

(R. 49-2 at 31, Feb. 1997 NATC Letter.)

---

[5] In response to Plaintiff's Local Rule 56.1(a) Statement of Undisputed Facts, Defendants "dispute the materiality" of these facts (and others) to Plaintiff's motion without admitting or denying their truth. (*See, e.g.*, R. 56, Defs.' Resp to Facts ¶¶ 4, 6.) This is unhelpful to the Court and not a proper way to respond under the Local Rules, which require squarely admitting or denying each proposed fact. N.D. ILL. L.R. 56(b)(3)(B); *Ricco v. Sw. Surgery Ctr., LLC*, 73 F. Supp. 3d 961, 965 (N.D. Ill. 2014); *see also Fenje v. Feld*, 301 F. Supp. 2d 781, 818 (N.D. Ill. 2003) ("Objecting to materiality does not deny a fact."), *aff'd*, 398 F.3d 620 (7th Cir. 2005). Plaintiff's proposed facts which were not controverted in the required manner will be deemed admitted. *See Martin v. Sutton Corp.*, No. 11 C 8648, 2014 WL 4911600, at *2 n.5 (N.D. Ill. Sept. 30, 2014) (deeming proposed facts admitted where sole objection was immateriality); *Lundy v. City of Calumet City*, No. 09 C 6333, 2010 WL 4386844, at *1 (N.D. Ill. Oct. 27, 2010) (same).

In a letter dated February 25, 1997, counsel for Plaintiff replied, stating:

> I received your letter dated February 24, 1997 and, while I think that the sides are closer than before, the letter does not settle this issue. As we have discussed, [Plaintiff] owns the "1.0", "1.25" and "1.5" marks. The understanding we would like to reach is that [Plaintiff] would not proceed with a claim against NATC based upon NATC's past use if NATC agrees that the marks belong to [Plaintiff] and that neither NATC or any of its affiliated or related companies will use or infringe upon [Plaintiff's] marks in the future. The implication in your letter was that NATC had decided to refrain from infringing upon or using the marks, but reserved the right to do so in the future. In order to resolve this matter, [Plaintiff] must require that NATC acknowledge [Plaintiff's] rights and agree not to use or infringe upon the marks in the future.

(R. 61-2 at 10, Feb. 1997 DRL Letter.)

In a second response dated March 3, 1997, Defendants' counsel wrote back:

> NATC has considered your letter of February 25, 1997 to us in this matter, as well as your further comments conveyed during our telephone conversation of February 26, 1997.
>
> NATC's management wishes to assure [Plaintiff] that it has no intention of using the designations 1.0, 1.25 and 1.5 for its cigarette papers. It is hopeful that this matter can be laid to rest.

(R. 49-2 at 32, March 1997 NATC Letter.)

In a letter dated March 4, 1997, counsel for Plaintiff again replied, stating:

> Your letter dated March 3, 1997, brings us closer to resolving the issues regarding NATC's use of [Plaintiff's] proprietary "1.0", "1.25" and "1.5" designations which has been the subject of our prior correspondence, but is not sufficient to conclude this matter. The central point which the prior correspondence evades is that these marks are owned by [Plaintiff] and may not be used by NATC without [Plaintiff's] prior authorization. Accordingly, I must ask that your client execute a copy of the enclosed acknowledgment and return it to me to resolve this matter without further legal action.

(R. 61-2 at 11, March 1997 DRL Letter.) Along with this letter, counsel for Plaintiff enclosed an

"Acknowledgment" for Defendants to sign, which would have formally acknowledged that

Plaintiff was the owner of the Point Marks for use in connection with cigarette papers and affirmed that "[n]either NATC nor any of its affiliates or licensees will use any of the '1.0', '1.25' or '1.5' marks without proper authorization from the owner of such trademark designations." (*Id.* at 12, March 1997 Proposed Acknowledgement.)

In its third response, dated April 4, 1997, Defendants' counsel wrote back:

> With reference to your letter to us of March 4, 1997, we regret that we have been unable to respond up to this point due to the urgency of other business matters.
>
> Nevertheless, please be assured that NATC has ceased usage of the designations 1.0, 1.25 and 1.5 in connection with its cigarette papers, in order to assure [Plaintiff] of its good faith.

(R. 49-2 at 33, April 1997 NATC Letter.) However, while Defendants' counsel responded to Plaintiff's March 4, 1997, letter, Defendants never executed the Acknowledgement. (R. 56, Defs.' Resp. to Facts ¶ 27; *id.*, Defs.' Add'l Facts ¶ 7.)

Defendants' distribution arrangement with Bolloré and license to use the ZIG-ZAG mark are governed by an Amended and Restated Distribution and License Agreement, dated November 30, 1992, as amended (the "License Agreement"). (*Id.*, Defs.' Resp. to Facts ¶ 7; R. 18, Answer ¶ 32.) The License Agreement is a long-term agreement that automatically renews for successive 20-year terms and was most recently renewed in November 2012. (R. 56, Defs.' Resp. to Facts ¶¶ 12-14.) It is a valuable asset whose continuation is of importance to Defendants. (R. 18, Answer ¶ 35.) Defendants' parent company, Turning Point Brands, Inc. ("Turning Point"), is party to a $170 million first-tier credit facility that expressly requires Defendants to maintain the License Agreement. (R. 56, Defs.' Resp. to Facts ¶ 20.) In addition, in filings with the Securities and Exchange Commission (SEC) for an initial public offering, Turning Point has identified Bolloré as Defendants' most important supplier. (*Id.* ¶ 19.)

The License Agreement includes a non-compete provision under which, during the term of the agreement and for a period of five years after termination, Defendants are prohibited from directly or indirectly manufacturing, distributing, marketing, or selling any cigarette papers or other tobacco accessories in the United States other than those supplied by Bolloré. (R. 56, Defs.' Resp. to Facts ¶¶ 9-10, 17; R. 18, Answer ¶¶ 34, 45.) However, in the event that Bolloré is unable or declines to continue supplying cigarette papers to Defendants, or permanently discontinues manufacturing them, the License Agreement permits Defendants to secure an alternate supplier. (R. 56, Defs.' Resp. to Facts ¶ 10; R. 53-1 at 28, License Agreement ¶¶ 3(g), 10(a)-(b).) The License Agreement gives Defendants the right to terminate the agreement in the event that Bolloré becomes insolvent or undergoes bankruptcy or an equivalent reorganization. (R. 53-1 at 28, License Agreement ¶ 6(b).) Other than those circumstances, however, the License Agreement does not give Defendants the right to unilaterally terminate it. (R. 56, Defs.' Resp. to Facts ¶¶ 15-16.)

The License Agreement does not mention or expressly address Defendants' use (or non-use) of size indicators or decimal designations, such as the Point Marks, on cigarette papers. (R. 56, Defs.' Add'l Facts ¶ 9.) However, it does require Defendants to submit for Bolloré's approval any advertising, promotional, or marketing materials. (*Id.*, Defs.' Resp. to Facts ¶ 11.) The License Agreement specifies that Bolloré's approval "shall not be unreasonably withheld" and requires Bolloré to "specify the reasons" for any disapproval. (R. 53-1 at 28, License Agreement ¶ 4(a).) In 2003, Defendants sought permission from Bolloré to use the decimal designation "1.0" on ZIG-ZAG cigarette papers that they sold in the U.S., but Bolloré refused. (R. 56, Defs.' Resp. to Facts ¶ 22; *id.*, Defs.' Add'l Facts ¶ 8.)

In the past, Bolloré and its predecessor-in-interest, Societé Job, have recognized

Plaintiff's trademark rights in the Point Marks and agreed not to use them for cigarette papers.

(*Id.*, Defs.' Resp. to Facts ¶ 21.) In a letter to Plaintiff's Chairman, Donald Levin, dated May 4,

2011, Bolloré's Industrial Manager, Cedric Bolloré, summarized Bolloré's position:

> This will confirm several long-established points. I believe, based on our long experience in the relevant market, that your companies have exclusively used the marks "1.0," "1.25" and "1.5" on cigarette papers for many years in the United States. Our company (and its predecessors, Societe Job and Bolloré Technologies, S.A.) have made papers for the cigarette paper industry, including your companies, for many decades, and we are not aware of others who have used those marks.

> Moreover, I am aware that before we acquired Societe Job, Societe Job had acknowledged that you had these rights. For example, I am aware that Societe Job agreed not to oppose your trademark applications for the marks "1.0," "1.25" and "1.5" when published for opposition in the early 1980's. Our company has always conducted its business on the basis that you had the exclusive right to use of "1.0," "1.25" and "1.5".

> Thus, for example, in 1987, our American distributor for Zig-Zag cigarette papers asked us to make "Zig-Zag 1.5" papers for them. We refused, because of your prior use of "1.5" and your trademark registration of "1.5" for cigarette papers sold by your companies.

> Our current distributor for Zig-Zag in the U.S., North Atlantic Trading Co., Inc. ("NATC"), is also aware of your use of "1.0," "1.25" and "1.5," and, when NATC asked about using the designation "1.0" to promote Zig-Zag papers in or about 2003, we did not approve its use in light of your trademark registration, your prior use and the practice we and our predecessors have adhered to since the 1980's.

> Confirming our understanding, it continues to be our position that we are not permitted to use the decimal designations "1.0," "1.25" and "1.5" in connection with the sale of any cigarette papers for

distribution in the United States, and we hereby confirm that we have not done so, and have agreed not to do so in the future.[6]

(*Id.* ¶ 23; R. 49-1 at 18, 2011 Bolloré Letter.)

Along with the letter, Bolloré supplied Plaintiff with a signed "Consent to Registration" in which it consented to Plaintiff's registration and use of the Point Marks in both stylized and standard character form for cigarette papers and agreed not to challenge, seek to cancel, or oppose any of Plaintiff's existing registrations or pending applications for the Point Marks. (R. 56, Defs.' Resp. to Facts. ¶ 24; R. 49-1 at 20, 2011 Bolloré Consent.) Bolloré stated that its consent was "based on the belief that the marks '1.0', '1.25' and '1.5' indicate that [Plaintiff] or

---

[6] Defendants object to the contents of the letter as inadmissible hearsay. (R. 56, Defs.' Resp. to Facts ¶ 23.) Plaintiff responds that the contents are admissible as statements affecting an interest in property under Federal Rule of Evidence 803(15) or as statements against interest under Rule 804(b)(3). (R. 72, Reply at 11.) On summary judgment, the Court may consider any evidence that could be put in admissible form at trial. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016); *see also* FED. R. CIV. P. 56(c)(2) (allowing objections to summary judgment evidence that "cannot be presented in a form that would be admissible in evidence"). Plaintiff could likely offer a witness at trial—such as Levin—to authenticate the letter. *See* FED. R. EVID. 901(b)(1). But its contents, if offered at trial for the truth of the matters asserted, would likely constitute hearsay. For the Rule 803(15) exception to apply, the document containing hearsay must "purport[] to establish or affect an interest in property," FED. R. EVID. 803(15), which generally means that it must be a "dispositive document" such as a formal title document, mortgage, lien, or the like, *see* 30B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 6923 (2017 ed.) (explaining that statements in such documents are considered reliable because they ordinarily are subject to scrutiny and adversarial negotiation and verification). The letter does not qualify; it is simply correspondence recounting a history of dealings between and among Plaintiff, Bolloré, and Bolloré's predecessor and distributors. Rule 803(15) therefore does not apply. Rule 804(b)(3) does not apply either because Plaintiff has not established or even argued Cedric Bolloré's likely unavailability as a witness. *See* FED. R. EVID. 804(b). Nor are the letter's contents sufficiently against Bolloré's interest. Acknowledging Plaintiff's prior use of, and registered rights in, the Point Marks might undermine Bolloré's future ability to take a contrary position, but that is not "powerfully" against Bolloré's interests. *See* 30B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 6995 (2017 ed.) ("Only powerfully [against-interest] statements qualify for admission under Federal Rule of Evidence 804(b)(3)."). Nevertheless, because its contents do not change the outcome of Plaintiff's motion, the Court will consider the letter.

its distributor Republic Tobacco L.P. is the source of the products that bear those marks."[7]
(R. 49-1 at 20, 2011 Bolloré Consent.)

## PROCEDURAL HISTORY

On July 1, 2016, following protracted proceedings, the TTAB issued its consolidated decision in Opposition No. 91158276, cancelling Plaintiff's three registrations for the Point Marks in stylized form, and sustaining Defendants' opposition to Plaintiff's applications to register the Point Marks "1.5" and "1.25" in standard character form, on the ground that the marks were generic. *N. Atl. Operating Co., Inc., v. DRL Enters., Inc.*, Opp. No. 91158276, 2016 WL 3876809, at *41 (T.T.A.B. July 1, 2016). As relevant here, the TTAB held that Defendants have standing because, as competitors of Plaintiff, they "have a legitimate interest in preventing [Plaintiff] from gaining an unfair competitive advantage by maintaining the existing registrations for and registering purportedly additional generic and/or descriptive terms for cigarette rolling papers." *Id.* at *10-12. On August 26, 2016, Plaintiff filed its complaint with this Court for review of the TTAB's decision. (R. 1, Compl. ¶¶ 7, 40, 59-61.) Defendants answered on September 20, 2016. (R. 18, Answer.) Discovery proceeded and closed on November 14, 2017. (R. 41, Min. Entry.)

On August 1, 2017, Plaintiff moved for summary judgment reversing the TTAB's decision. (R. 45, Mot.) Plaintiff contends that the undisputed facts show that, as a matter of law, Defendants lack the "real interest" necessary for standing to challenge Plaintiff's trademark registrations or applications for the Point Marks. (*Id.* at 1-2.) Plaintiff argues that Defendants have acknowledged Plaintiff's rights in the Point Marks and have represented that they have no

---

[7] The Court notes that the declaration submitted by Plaintiff from Levin significantly misquotes the underlying Consent to Registration document, and does so in a manner that could not be the result of a mere transcription error. (*See* R. 49-1, Levin Decl. at 13 (misquoting the final paragraph of the 2011 Bolloré Consent).) In the interest of accuracy, the Court has looked to the underlying document.

intention of using them, "no matter the outcome of these proceedings." (R. 51, Mem. at 7-8.) Plaintiff further argues that even if Defendants wanted to use the Point Marks with cigarette papers, the License Agreement with Bolloré effectively prohibits them from doing so. (*Id.* at 9-15.) Plaintiff points out that under the License Agreement, Defendants may only distribute cigarette papers supplied by Bolloré and must obtain Bolloré's approval for all marketing materials. (*Id.* at 3-4, 12.) But, Plaintiff points out, Bolloré has recognized Plaintiff's trademark rights in the Point Marks and has previously refused to allow Defendants to use them when marketing Bolloré's ZIG-ZAG cigarette papers. (*Id.* at 2, 5-6.) Plaintiff contends, in other words, that Defendants have essentially contracted away their standing by relinquishing any ability to use the Point Marks to market cigarette papers. According to Plaintiff, prior litigation involving Defendants confirms that the License Agreement has this preclusive effect on Defendants' standing. (*Id.* at 6-7.)

Plaintiff also argues that there is no realistic possibility that Defendants could extricate themselves from the License Agreement in order to make use of the Point Marks, because the License Agreement is essentially perpetual, does not give them any termination rights, and, in any event, is too important to their business to terminate or breach, as evidenced by Turning Point's statements in SEC filings and its $170 million line of credit that expressly requires Defendants to maintain the License Agreement. (*Id.* at 4-5, 12.) In sum, Plaintiff contends that, because Defendants have no current or prospective right to use the Point Marks, they have no "real interest" in the proceedings and therefore lack standing.

Defendants respond that they easily satisfy the "decidedly liberal and permissive" threshold for standing. (R. 62, Opp'n at 2.) They argue first that the License Agreement with Bolloré is altogether irrelevant because the fact that they are competitors of Plaintiff is sufficient,

in and of itself, to confer standing. (*Id.* at 4-5.) Defendants argue further that even if it were relevant, the License Agreement does not deprive them of standing because they have not actually "contracted away" anything. (*Id.* at 7-8.) Instead, Defendants explain, the License Agreement merely requires Bolloré's approval to use the Point Marks, which Bolloré cannot unreasonably withhold and may well grant in the event that the registrations and applications for the Point Marks are finally rejected—notwithstanding any past refusals by Bolloré or assurances it may previously have given to Plaintiff. (*Id.* at 5, 9-12.) And even if the License Agreement expressly prohibited them from using the Point Marks, Defendants argue, they would still have standing because recent case law holds that "even an opposer who has contractually promised not to use a generic or descriptive term has a competitive 'interest' in preventing its rivals from registering that term." (*Id.* at 6-9.) Last, Defendants deny that their prior correspondence with Plaintiff constitutes an acknowledgement of Plaintiff's rights in the Point Marks or an enforceable commitment to not use them. (*Id.* at 13-14.)

## ANALYSIS

In order to have standing to oppose an application for trademark registration, an opposer must "believe[] that he would be damaged by the registration of a mark." 15 U.S.C. § 1063(a). Similarly, a petitioner seeking to cancel an already registered mark must "believe[] that he is or will be damaged" by the registration. 15 U.S.C. § 1064. These statutory provisions have been interpreted to require a "real interest" in the outcome of the proceeding and a "reasonable basis" in fact for the opposer's or petitioner's belief that it is or will be damaged by the challenged

registration.[8] *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1376 (Fed. Cir. 2012) (citation omitted). The opposer or petitioner bears the burden of pleading and ultimately proving standing. *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1092 (Fed. Cir. 1984). The purpose of standing is to "prevent litigation where there is no real controversy between the parties," that is, where a petitioner or opposer is "no more than an intermeddler." *Coach Servs., Inc.*, 668 F.3d at 1376 (citation and internal quotation marks omitted). Put differently, it is intended to "preclude meddlesome parties from instituting proceedings as self-appointed guardians of the purity of the [trademark] Register." *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1027 (C.C.P.A. 1982).

Standing is considered a "low threshold, intended only to ensure that the plaintiff has a real interest in the matter," *Syngenta Crop Prot., Inc. v. Bio-Chek, LLC*, 90 U.S.P.Q.2d 1112, 1118 n.8 (T.T.A.B. 2009), and is "relatively easy to meet in the vast majority of cases," 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:7 (5th ed. 2017). The opposer or petitioner "need only be something more than a gratuitous interloper or a vicarious avenger of someone else's rights." *Id.* "Since 'mere intermeddlers' only rarely bring [trademark] challenges, few proceedings are ever dismissed for lack of standing and a challenge to standing is usually just a futile procedural gesture." *Id.* § 20:46.

Nevertheless, the standing requirement does impose some limits. For example, in *Nobelle.com, LLC v. Qwest Communications International, Inc.*, 66 U.S.P.Q.2d 1300 (T.T.A.B. 2003), the petitioner argued that it had standing in a cancellation proceeding based on

---

[8] The requirements for standing are generally the same in both opposition and cancellation proceedings. 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:46 (5th ed. 2017); *see also Young v. AGB Corp.*, 152 F.3d 1377, 1380 (Fed. Cir. 1998) ("The linguistic and functional similarities between the opposition and cancellation provisions . . . mandate that we construe the requirements of these provisions consistently.").

"incubating and developing" an electronics product on which it might want to use the registered mark. 66 U.S.P.Q.2d at 1304. The petitioner admittedly was not close to bringing the product to market, could offer no time frame when it might do so, and was "as likely to end up in the winery or orchard business" as it was to make and sell the product. *Id.* at 1304 & n.10. The petitioner, in other words, simply had "an idea for a product, which may or may not ever be brought to market." *Id.* at 1304. While noting that the threshold for standing "generally is quite low," the TTAB held that these circumstances failed to establish standing because they failed to give the petitioner a real interest in the outcome of the proceeding. *Id.*

When a mark is challenged as generic or descriptive, as is the case here, the requirements for standing are even more lenient. *See* 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 20:11, 20:50 (5th ed. 2017). For example, when a mark could be used to describe a competitor's own product, the competitor has standing whether or not it has actually used the mark descriptively with its own products. *Id.* § 20:11; *see also Cummins Engine Co. v. Cont'l Motors Corp.*, 359 F.2d 892, 895 (C.C.P.A. 1966) (rejecting challenge to standing even though petitioner "was not using the term as a trademark nor did it co[n]template doing so," and concluding that "[a]ppellee as a competitor of appellant clearly has reason to believe it will be damaged to the extent required by statute"); *Meehanite Metal Corp. v. Int'l Nickel Co., Inc.*, 262 F.2d 806, 807-808 (C.C.P.A. 1959) ("Under these circumstances it is not necessary that opposer make a showing of actual use of the mark to establish that it would probably be damaged by the registration."); *Prince Corp. v. Rosen Prods., LLC*, Opp. No. 119,292, 2002 WL 2022633, at *1 n.2 (T.T.A.B. Aug. 30, 2002) ("[T]here is no requirement that a plaintiff establish that it made prior descriptive use of the term. It is sufficient to demonstrate standing that the plaintiff show that it is a competitor[.]"); *Southwire Co. v. Kaiser Aluminum &*

*Chem. Corp.*, 196 U.S.P.Q. 566, 572 (T.T.A.B. 1977) ("[C]ontrary to applicant's assertion . . . it is not necessary that opposer make a showing of actual use to establish damage. It is sufficient to show that it is engaged in the same or a similar business as applicant, and that damage to it will ensue if fair use of the term by it or its customers to describe their goods will be denied by the registration sought.").

In light of the relatively low threshold for standing, particularly where—as here—a mark is challenged as descriptive, the Court concludes that a reasonable jury could find that Defendants have standing. Plaintiff is consequently not entitled to summary judgment.

As an initial matter, Plaintiff's argument that Defendants have acknowledged its rights in the Point Marks and have agreed to not use them, no matter the outcome of these proceedings, is simply not borne out by the record. Plaintiff asserts that the 1997 cease-and-desist correspondence between the parties shows that Defendants "assure[d] [Plaintiff] that [they] would respect [Plaintiff's] rights in the Point Marks" and "agreed to not use the Point Marks." (R. 51, Mem. at 7.) It is obvious, however, that the correspondence establishes no binding commitment that would preclude Defendants from using the Point Marks, nor is it as unequivocal as Plaintiff suggests. While Defendants stated that they would continue using fractional terms for their cigarette papers, they also expressly noted that their decision to refrain from using the Point Marks was made solely to "avoid the expense and distraction of litigation" and was "without prejudice and not to be deemed binding through contract, estoppel or otherwise." (R. 49-2 at 31, Feb. 1997 NATC Letter.) Plaintiff recognized as much at the time and expressed dissatisfaction with Defendants' disclaimer, responding that the "implication in [Defendants'] letter was that NATC had decided to refrain from . . . using the marks, but reserved the right to do so in the future." (R. 61-2 at 10, Feb. 1997 DRL Letter.) Plaintiff also

responded that Defendants' non-binding assurances were "not sufficient to conclude th[e] matter" and insisted—unsuccessfully—that Defendants execute a formal acknowledgement of Plaintiff's trademark rights and contractually agree to not use the Point Marks. (R. 61-2 at 11, March 1997 DRL Letter; R. 56, Defs.' Resp. to Facts ¶ 27.) Given this record, a reasonable jury could easily find that the 1997 correspondence between the parties does not preclude Defendants from using the Point Marks or show that they have forever abandoned any intent of using them to promote cigarette papers.

Turning to the remainder of the undisputed facts, there is sufficient evidence from which a reasonable jury could conclude that Defendants have a real interest in the proceedings. To begin with, the fact that Plaintiff and Defendants are longtime competitors in the roll-your-own cigarette paper business would ordinarily be sufficient evidence, "in and of itself," to establish that Defendants have standing. *Ferro Corp. v. SCM Corp.*, 219 U.S.P.Q. 346, 352 (T.T.A.B. 1983). Plaintiff's cease-and-desist letter objecting to Defendants' anticipated use of the "1.5" mark could further support a jury's conclusion that Defendants have standing.[9] *See Dist. Enters., Inc. v. Indep. Towing & Recovery, Inc.*, Cancellation No. 9205530, 2015 WL 7273029, at *5 (T.T.A.B. Oct. 23, 2015) (finding that petitioner had a real interest and therefore standing because "the parties are competitors and . . . [r]espondent ha[d] sent a cease-and-desist letter to [p]etitioner"); *Ipco Corp. v. Blessings Corp.*, 5 U.S.P.Q.2d 1974, 1976-77 (T.T.A.B. 1988)

---

[9] It is unclear from the record whether Defendants actually began using the "1.5" mark at the time, or simply prepared to do so. If they began using it before receiving Plaintiff's cease-and-desist letter, that would further support standing. *See Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 U.S.P.Q.2d 1750, 1760-61 (T.T.A.B. 2013) (finding that petitioner had standing where respondent and petitioner were competitors and respondent "sent a cease and desist letter to petitioner requesting that petitioner cease operation of its . . . web site and domain name" that incorporated the challenged mark), *aff'd* 565 F. App'x 900 (Fed. Cir. 2014); *Paramount Baking Co. v. Am. Bakery Prods., Inc.*, Cancellation No. 9204352, 2005 WL 1953642, at *1 (T.T.A.B. Aug. 2, 2005) (holding that petitioner had standing where "respondent's president . . . found petitioner's product in the marketplace [using the challenged mark], confiscated the sign, and turned it over to his lawyer who . . . sent a cease and desist letter").

(concluding that opposer's standing was supported by "cease and desist letter sent by applicant" to opposer). More generally, the undisputed fact that Defendants have twice sought to use the Point Marks to market cigarette papers—once in 1997, which precipitated Plaintiff's cease-and-desist letter, and again in 2003, when Bolloré refused to give them permission—could also support a jury's conclusion that they have a real interest and are more than mere intermeddlers.

Plaintiff's principal argument is that Defendants have no real interest in the proceeding because the License Agreement—buttressed by Bolloré's recognition of Plaintiff's rights and its past refusal to allow Defendants to use the Point Marks—effectively prohibits them from using the Point Marks. Viewed in the light most favorable to Defendants, however, Bolloré's past refusals have been based in large part on Plaintiff's exclusive trademark registrations for the Point Marks. (*See* R. 49-1 at 18, 2011 Bolloré Letter (stating that Bolloré's refusal in 2003 was based on "[Plaintiff's] trademark registration, [Plaintiff's] prior use and the practice we and our predecessors have adhered to since the 1980's").) It is plausible—and a jury could infer—that Bolloré would no longer withhold permission in the event that those registrations were ultimately cancelled. In other words, a reasonable jury could conclude that Defendants have a real interest in these proceedings because the only obstacle to Defendants' use of the Point Marks has been Bolloré's refusal, which in turn is based largely on the existence of the challenged registrations.

Even if the License Agreement expressly prohibited Defendants from using the Point Marks, which is not the case, a reasonable jury could still conclude that they have a real interest sufficient for standing. As Defendants point out, the TTAB has held in a factually analogous case that even competitors who have contractually committed to not use a mark have standing to challenge the mark as descriptive or generic, due to the competitive advantage that registration might give to the mark-holder. In *Duramax Marine, LLC v. R.W. Fernstrum & Co.*, 80

U.S.P.Q.2d 1780 (T.T.A.B. 2006), the trademark applicant argued that the opposer had "contracted away its standing" in a settlement of prior litigation with the applicant. 80 U.S.P.Q.2d at 1787. In the settlement agreement, the opposer had expressly agreed to not manufacture the same type of boat keel cooler that the applicant manufactured and to not advertise its keel coolers using the depiction shown in the challenged mark. *Id.* at 1787-88. The TTAB did not agree that this contractual limitation on the opposer's use of the mark deprived it of standing, explaining that "[a]s a competitor, opposer has an interest in seeing that any other competitor in the field of keel cooler manufacturing and sales does not register a depiction of a keel cooler that is . . . descriptive." *Id.* at 1787. The TTAB reasoned that, even assuming that the opposer had contractually relinquished the right to market its keel coolers using the challenged mark, it nevertheless had a real interest in the proceeding because "the exclusive registration of assertedly descriptive matter by a competitor might provide that competitor with an advantage, for example, in marketing its products."[10] *Id.*

By comparison, Defendants' standing here is on an even stronger footing than the opposer in *Duramax*. While the License Agreement gives Bolloré some discretion over Defendants' marketing of cigarette papers, it does not expressly prohibit them from using the Point Marks. Even if Bolloré was firmly committed to never approving Defendants' use of the Point Marks—an inference that the Court will not draw at this stage because it would be favorable to Plaintiff, the moving party—Defendants would still have standing under *Duramax*

---

[10] The TTAB also noted that the settlement agreement contemplated a possible, though contingent, future right of the opposer to manufacture and market keel coolers using the challenged mark in the event that the applicant ceased making that design of keel cooler. *Duramax Marine, LLC v. R.W. Fernstrum & Co.*, 80 U.S.P.Q.2d 1780, 1788 (T.T.A.B. 2006). The opposer's "prospective interest in one day using the proposed mark" was independently sufficient to establish standing. *Id.*

because they have an interest in ensuring that competitors in the cigarette paper industry do not register or maintain marks that are allegedly descriptive.[11] *See id.* at 1787.

Plaintiff appears to recognize that *Duramax* is squarely on point and substantially undermines its standing argument, but argues that it is not binding on this Court. (R. 72, Reply at 6 n.4.) Plaintiff also argues that, in any event, *Duramax* was wrongly decided. (*Id.* at 1, 3-6; R. 51, Mem. at 13-14.) The Court is not persuaded on either front. While *Duramax* certainly is not binding on this Court, federal courts routinely treat the TTAB's precedential decisions[12] as persuasive authority due to its "expertise in trademark disputes." *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 n.1 (6th Cir. 2017) (citation omitted) (collecting cases); *see also, e.g.*, *City of Carlsbad v. Shah*, 666 F. Supp. 2d 1159, 1167 n.10 (S.D. Cal. 2009) (relying on precedential TTAB decision as "highly persuasive"); *Buti v. Impressa Perosa, S.R.L.*, 935 F. Supp. 458, 471 (S.D.N.Y. 1996) ("Although . . . the decisions of the TTAB are not binding on this Court . . . they are nevertheless entitled to great weight." (citation and internal quotation marks omitted)), *aff'd sub nom. Buti v. Perosa, S.R.L.*, 139 F.3d 98 (2d Cir. 1998). The Court likewise views *Duramax* as persuasive authority, particularly as applied to the analogous circumstances in this case.

---

[11] A reasonable jury could also conclude that Defendants have standing under *Duramax*'s alternative reasoning that a prospective future right to use the mark, even if contingent and uncertain, provides standing. The settlement agreement in *Duramax* gave the opposer the right to market keel coolers using the challenged mark in the event that the applicant ceased making that type of keel cooler. *Duramax Marine, LLC*, 80 U.S.P.Q.2d at 1788. Similarly, the License Agreement allows Defendants to distribute cigarette papers from suppliers other than Bolloré if Bolloré exits the cigarette paper industry, or to terminate the License Agreement if Bolloré becomes insolvent or bankrupt. (R. 53-1 at 28, License Agreement ¶¶ 3(g), 6(b), 10(a)-(b).)

[12] The TTAB designates all final decisions as either precedential or nonprecedential and considers only precedential decisions binding in future cases. *Citation of Opinions to the Trademark Trial and Appeal Board*, OFF. GAZ. PAT. & TRADEMARK OFFICE (Jan. 23, 2007); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE § 1203.02(f) (June 2017).

The Court is also unpersuaded by Plaintiff's argument that *Duramax* was wrongly decided. Plaintiff contends that a key premise of the many decisions holding that a competitor had standing was that the competitors in those cases had a present or prospective right to use the challenged mark themselves; Plaintiff argues that *Duramax* ignored this premise in extending standing to a competitor with no such right. (R. 72, Reply at 2-6.) While some cases do suggest that a competitor's standing derives from (and might therefore depend on) having "a present or prospective right to use the term descriptively in its business," *Binney & Smith Inc. v. Magic Marker Indus., Inc.*, 222 U.S.P.Q. 1003, 1010 (T.T.A.B. 1984), other cases have stated that being a competitor is "sufficient, in and of itself" to confer standing, *Ferro Corp.*, 219 U.S.P.Q. at 352; *see also The Topps Co., Inc. v. Panini Am., Inc.*, 113 U.S.P.Q.2d 1808, 1813 (T.T.A.B. 2015) (noting that for standing "it is enough for [o]pposer to establish that it is engaged in the sale of the same or related goods, that is, [that] [o]pposer is a competitor"); *No Nonsense Fashions, Inc. v. Consol. Foods Corp.*, 226 U.S.P.Q. 502, 504 (T.T.A.B. 1985) (noting that "a sufficient basis for standing . . . is that the opposer or cancellation petitioner be a competitor of the applicant . . . in respect of the concerned goods"). Some decisions also suggest that a competitor's standing could be based on other harms flowing from the exclusive registration of a descriptive term, such as the possibility that consumers could be "deceived or misled into believing goods [marketed with the descriptive term] are the only ones of that type available in the marketplace," *Southwire Co.*, 196 U.S.P.Q. at 573, or the competitive disadvantage of one's customers being prevented from using the term to describe the competitor's goods, *see Meehanite Metal Corp.*, 262 F.2d at 808 ("It is enough [that] the use of such term by it *or its customers* to describe their goods is

denied." (emphasis added)). Against the backdrop of this decisional law, the Court cannot agree with Plaintiff that *Duramax* was a significant aberration.[13]

In addition, Plaintiff cites no authority—and the Court has found none—that in the nearly 12 years since *Duramax* was decided disapproved its holding or questioned its reasoning. To the contrary, subsequent TTAB decisions have approvingly cited *Duramax* on the issue of standing. *See, e.g., Montecash LLC v. Anzar Enters., Inc.*, 95 U.S.P.Q.2d 1060, 1062 (T.T.A.B. 2010) (citing *Duramax* for proposition that "[c]ompetitors in the same field or industry as the respondent" have standing). In short, the Court is not persuaded by Plaintiff's argument that *Duramax* was wrongly decided.

Plaintiff's final argument is that prior litigation involving Defendants confirms that the License Agreement poses an insurmountable obstacle to standing. (R. 51, Mem. at 6-7; R. 72, Reply at 11.) Plaintiff points to *Republic Tobacco L.P. v. North Atlantic Trading Co.*, No. 06 C 2738, 2007 WL 1424093 (N.D. Ill. May 20, 2007), a suit against Defendants brought in 2006 by Plaintiff's subsidiary. There, Defendants had attempted to assert a counterclaim for infringement of the ZIG-ZAG trademark under Section 43(a) of the Lanham Act, which gives standing for such a claim to "any person who believes that he or she is or is likely to be damaged." *Id.* at *2, *15; 15 U.S.C. § 1125(a)(1)(B). Defendants contended that they had standing to bring the counterclaim based on their status, under the License Agreement, as exclusive licensees of the ZIG-ZAG mark. *See Republic Tobacco*, 2007 WL 1424093, at *15-16. The court disagreed, noting that the express terms of the License Agreement "prohibited [Defendants] from bringing

---

[13] The Court also observes that over the past several decades, there has been "a clear trend towards relaxation of standing . . . requirements[.]" 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:7 (5th ed. 2017) (collecting cases); *see also id.* & n.4 (noting that "the requirements for standing . . . since enactment of the Lanham Act have become progressively less restrictive and more liberal in favor of allowing one to oppose" and collecting cases). To the extent that *Duramax* extended the competitor-standing rule, it may simply be a continuation of that trend.

suit in [their] own capacity." *Id.* at *16. Instead, pursuant to Paragraph 9(f), Defendants were required to notify Bolloré of any potential infringement and let Bolloré file suit. *Id.* In concluding that Defendants lacked standing under Section 43(a) to bring the counterclaims, the court reasoned that "[s]ince the Licensing Agreement is the only source that gives [Defendants] any interest in the ZIG–ZAG mark, the Licensing Agreement's refusal to give [Defendants] the right to sue under these circumstances strips [them] of the right to raise a Lanham Act Section 43(a) claim." *Id.* at *17.

Plaintiff argues that the court's reasoning in *Republic Tobacco* is equally applicable here because standing under Section 43(a) is "predicated on functionally identical language" to that in 15 U.S.C. §§ 1063(a) and 1064. (R. 51, Mem. at 7.) Just as the License Agreement stripped Defendants of standing to bring a trademark infringement claim in *Republic Tobacco*, Plaintiff reasons, so too does it strip Defendants of standing to bring proceedings before the TTAB to cancel Plaintiff's trademark registrations or oppose Plaintiff's trademark applications. This argument misses the mark. In *Republic Tobacco*, Defendants lacked standing to bring an infringement counterclaim because the License Agreement expressly deprived Defendants of the right to do so. Here, by contrast, the License Agreement is undisputedly silent on Defendants' right or ability to bring trademark cancellation proceedings or oppose Plaintiff's applications before the TTAB. In short, the decision in *Republic Tobacco* is simply not relevant here.

## CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for summary judgment (R. 45). The parties shall appear for a status hearing on March 21, 2018, at 9:45 a.m., for the purpose of discussing future proceedings in this case including whether the Court, in light of this opinion, should enter a final judgment in favor of Defendants so that Plaintiff may proceed with

any planned appeal of this decision. The parties are also DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities for this inherent business dispute.

ENTERED:

Chief Judge Rubén Castillo
United States District Court

Dated: March 12, 2018